# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

RUSORO MINING LIMITED,

                    Plaintiff,

          - vs. -

BOLIVARIAN REPUBLIC OF VENEZUELA;
PETRÓLEOS DE VENEZUELA, S.A.; PDV
HOLDING, INC.; CITGO HOLDING, INC.;
CITGO PETROLEUM CORPORATION;
EULOGIO DEL PINO; ORLANDO CHACIN;
JESUS LUONGO; AND ANTON CASTILLO,

                    Defendants.

Civ. No.18-1458

**COMPLAINT**

Plaintiff Rusoro Mining Limited ("Rusoro" or "Plaintiff"), by and through its undersigned counsel, alleges as follows:

## Introduction

1.    The Bolivarian Republic of Venezuela ("Venezuela") has long been a magnet for foreign investors.  In recent years, however, the relationship between those foreign investors and the Venezuelan state has soured.  Many, including Plaintiff Rusoro, saw their massive investments expropriated or substantially devalued by Venezuelan state action, and brought arbitration claims under the bilateral investment treaties that were designed to protect them.  In the past decade alone, over 30 foreign investors operating in a wide variety of economic sectors have filed arbitrations against Venezuela, with those claimants seeking **tens of billions** of dollars in damages.  Venezuela's late former president, Hugo Chávez, defiantly announced that the claimants in these cases would never recover anything.

2.      As described further herein, Venezuela dominates and extensively controls a series of affiliated corporations that function as alter egos of Venezuela, including CITGO Petroleum Corporation ("CITGO Petroleum"), a U.S.-based petroleum refiner and retailer with its headquarters in this District.  CITGO Petroleum operates three large refineries and thousands of service stations across the United States.  In 2016, it reported $19 billion in gross revenues.  As a state-owned petroleum company operating with substantial assets in the United States, CITGO Petroleum is an appropriate and attractive target for Venezuela's growing list of unpaid creditors.

3.      Confronted with billions of dollars in arbitration claims and potential judgments, Venezuelan government officials sought to effectively loot CITGO Petroleum's U.S.-based parent companies, in whose possession Venezuela's assets were potentially subject to execution in aid of judgments against the Venezuelan state, and to repatriate the resulting cash and other value from the United States to Venezuela, where they almost certainly would not be.  Specifically, between 2014 and 2017, Venezuela – which by 2014 had seen its economy suffer from plummeting oil prices – orchestrated a series of transactions, executed by affiliated entities under Venezuela's domination and control, to move billions of dollars in value out of the United States to Venezuela, all in a coordinated effort to hinder, delay or defraud its creditors, including Rusoro.

4.      The four affiliated entities dominated and controlled by Venezuela who participated in this Venezuela-orchestrated scheme, which was designed to work a fraud and injustice on creditors like Rusoro, were: Petróleos de Venezuela, S.A. ("PDVSA"), PDV Holding, Inc. ("PDVH"), CITGO Holding, Inc. (formerly known as PDV America, Inc.)

("CITGO Holding"), and CITGO Petroleum.  PDVSA, PDVH, CITGO Holding, and CITGO Petroleum are sometimes referred to herein as the "Alter Ego Entities."

5.      PDVSA is Venezuela's state-owned oil company.  It is owned directly by the Venezuelan state.

6.      CITGO Holding is the parent company of CITGO Petroleum.  The value of CITGO Holding is essentially derived from the value of CITGO Petroleum.

7.      PDVH is the parent company of CITGO Holding.  The value of PDVH is essentially derived from the value of CITGO Holding.

8.      CITGO Petroleum, CITGO Holding, and PDVH are incorporated in the United States.  PDVSA is the parent company of PDVH and is incorporated in Venezuela.

9.      The Alter Ego Entities are wholly owned, directly or indirectly, by Venezuela. They have overlapping directors and senior officers with direct connections to the Venezuelan government.  The Venezuelan government dominates and has approval rights over the day to day operations of the Alter Ego Entities to ensure effective and complete control over those entities. As described herein, Venezuela used that power to nullify all requisite corporate formalities in order to seize the substantial value related to CITGO Petroleum and remove it from the United States, offshore to Venezuela, in order to improperly shield that value from creditors like Rusoro.

10.     The Alter Ego Entities participated in this improper asset transfer scheme, and in doing so acted as mere agents and/or alter egos of Venezuela.  For this and other reasons, the Alter Ego Entities are indebted to Rusuro to the same extent as Venezuela.

11.     The directors and officers of PDVH and CITGO Holding were complicit in this improper scheme, as they, acting under color of their corporate authority, executed Venezuela's directives.  They looted their own companies through a combination of illegitimate transactions

that had no discernible business purpose, thereby rendering Venezuela and, to a major extent, the Alter Ego Entities, judgment-proof in the United States.

12.     Rusoro seeks a declaration that the Alter Ego Entities are agents and/or alter egos of Venezuela whose juridical independence should be disregarded, such that the actions taken by them should be imputed to Venezuela, and the liabilities of Venezuela owed to Rusoro should be deemed enforceable against them.

13.     Rusoro also seeks to reverse the dividends, described herein, that were fraudulently and unlawfully paid by CITGO Holding and PDVH in favor of PDVSA, or in the alternative, to hold CITGO Holding and PDVH liable to Rusoro for the amount of the illegal dividends (up to the amount of the Rusoro judgment against Venezuela).

14.     Rusoro also asks that the directors and officers of PDVH and CITGO Holding be held liable to their respective companies (and derivatively to the creditors of those companies, like Rusoro) for breaching their fiduciary duties and for engaging in corporate waste (a) by paying unlawful dividends from their respective companies that ultimately went from the United States to Venezuela, and (b) by improperly collateralizing their respective companies' U.S. assets for no consideration and while insolvent to support offshore obligations owed by PDVSA.

15.     Moreover, all of the non-individual Defendants should be held liable on a joint and several basis for their role in conspiring in, and aiding and abetting, this breach of fiduciary duty by the directors and officers of PDVH and CITGO Holding.

## PARTIES

16.      Plaintiff Rusoro is a Canadian corporation incorporated under the laws of British Columbia, Canada, with headquarters located at Suite 3123 – 595 Burrard Street, Vancouver, British Columbia, V7X 1J1, Canada.

17.     Defendant Venezuela is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602–1611.

18.     Defendant PDVSA is a Venezuelan corporation and putative instrumentality of Venezuela within the meaning of the FSIA.  Despite its establishment as a corporation with separate juridical existence, PDVSA is an organ of Venezuela whose core function is governmental.  It is required by Venezuelan law to perform and fund significant governmental functions that are completely unrelated to its ostensible mission as a petroleum company, it commingles its assets with those of the Venezuelan state, and operates as a government department or agency with no independence.  PDVSA's chief executive officer, who has plenary control over its activities and those of the other Alter Ego Entities, is a Venezuelan government minister and a general in the Venezuelan Army.

19.     Defendant PDVH is a Delaware corporation with its principal place of business at 1293 Eldridge Parkway, Houston, Texas 77077.  As noted, PDVH is a wholly-owned direct subsidiary of PDVSA.

20.     Defendant CITGO Holding is a Delaware corporation with its principal place of business at 1293 Eldridge Parkway, Houston, Texas 77077.  CITGO Holding is a wholly-owned direct subsidiary of PDVH, and a wholly-owned indirect subsidiary of PDVSA.

21.     Defendant CITGO Petroleum is a Delaware corporation with its principal place of business at 1293 Eldridge Parkway, Houston, Texas 77077.  CITGO Petroleum is a wholly-owned direct subsidiary of CITGO Holding, and a wholly-owned indirect subsidiary of PDVH and PDVSA.

22.     Defendant Orlando Chacin ("Chacin") was at all relevant times a director of both PDVH and CITGO Holding.

23.     Defendant Jesus Luongo ("Luongo") was at all relevant times a director of both PDVH and CITGO Holding.

24.     Defendant Anton Castillo ("Castillo") was at all relevant times a director of PDVH.

25.     Defendant Chacin, Luongo, and Castillo are collectively referred to as the "PDVH Individual Defendants."

26.     Defendant Eulogio del Pino ("Pino") was at all relevant times a director, chairman of the board and president of CITGO Holding.

27.     Pino, Chacin, and Luongo are collectively referred to as the "CITGO Holding Individual Defendants."  The PDVH Individual Defendants and Pino are collectively referred to as the "Individual Defendants."

28.     Venezuela, the Alter Ego Entities, and the Individual Defendants are collectively referred to as the "Defendants."

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a).

30.     Venezuela is a "foreign state" as defined under 28 U.S.C. § 1603, and PDVSA is an organ of Venezuela that is not a "separate legal person" within the meaning of 28 U.S.C. § 1603(b)(1), but rather is the same legal person as Venezuela for jurisdictional purposes.

31.     In the alternative, PDVSA is an agency or instrumentality of Venezuela within the meaning of 28 U.S.C. § 1603(b).

32.     At all times relevant herein, the Alter Ego Entities and the Individual Defendants acted as Venezuela's and PDVSA's agents.

33.     Neither Venezuela nor PDVSA is immune from the subject matter jurisdiction of this Court because this action is based upon (i) Venezuela's and PDVSA's commercial activity in the United States; (ii) Venezuela's and PDVSA's performance, directly and through their duly-designated and authorized agents, of at least one act in the United States in connection with commercial activity elsewhere; and/or (iii) Venezuela's and PDVSA's performance, directly and through their duly-designated and authorized agents, of an act or acts committed outside the United States in connection with their commercial activity elsewhere, which act(s) caused a direct effect in the United States.  Because neither Venezuela nor PDVSA is entitled to immunity under the FSIA, the Court has subject matter jurisdiction over this entire case pursuant to 28 U.S.C. § 1330(a).

34.     Because the Alter Ego Entities and Individual Defendants have acted at all times as Venezuela's agents in connection with the events at issue herein, the Alter Ego Entities' acts may be imputed to Venezuela, including, *inter alia*, for purposes of determining subject matter jurisdiction.

35.     Personal jurisdiction over Venezuela and PDVSA is conferred by 28 U.S.C. § 1330(b).  The Court will obtain personal jurisdiction over Venezuela and PDVSA pursuant to 28 U.S.C. § 1330(b) upon the completion of service of process pursuant to 28 U.S.C. § 1608, as no minimum contacts are required in connection with the establishment of personal jurisdiction over a foreign state.

36.     To the extent the Court finds that its exercise of personal jurisdiction over PDVSA requires a showing of minimum contacts, such minimum contacts exist.  Because PDVSA is a foreign state within the meaning of the FSIA, minimum contacts must be shown with the United States as a whole, rather than with Texas specifically.  As alleged herein,

PDVSA, acting as the agent and/or alter ego of Venezuela, and acting at various times through its (and Venezuela's) agents and/or alter egos, PDVH, CITGO Holding, and CITGO Petroleum, took actions in the United States on behalf of Venezuela to transfer Venezuelan assets from the United States, where they stood at risk of execution in aid of U.S. court judgments, to Venezuela, where they are effectively immune from execution in aid of such judgments, and took these actions for the purpose of hindering, delaying, and defrauding creditors like Rusoro.  The facts alleged herein suffice to justify the Court's exercise of specific personal jurisdiction over PDVSA.

37.     Personal jurisdiction in this Court is proper over PDVH, CITGO Holding, and CITGO Petroleum, each of which has its principal place of business in Texas.

38.     Personal jurisdiction is proper over the Individual Defendants, whose acts occurred, in whole or in part, in Texas, the principal place of business of both PDVH and CITGO Holding, the corporations for whom they serve as officers and directors.

39.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (f).  PDVH, CITGO Holding, and CITGO Petroleum each have their principal place of business in this District.  The actions referenced herein by the Individual Defendants occurred, in whole or in part, in this District.  Venezuela and PDVSA, through their agents PDVH, CITGO Holding, and CITGO Petroleum, do business in this District, and a substantial part of the acts at issue herein, occurred in this District at the offices of PDVH, CITGO Holding, and CITGO Petroleum.

## FACTS

### A.    RUSORO IS A JUDGMENT CREDITOR OF VENEZUELA.

40.     Plaintiff Rusoro was the controlling shareholder of 24 Venezuelan mining companies that held valuable contractual rights to explore, develop, and exploit gold in

Venezuela.   These mining rights were granted through an array of agreements with the Venezuelan government and Venezuelan state-owned corporations.

41.    In 2011, Venezuelan President Hugo Chávez declared the "immediate nationalization" of the Venezuelan gold mining sector.  As of March 2012, President Chávez issued a nationalization decree that formally extinguished all of Rusoro's mining rights.  The Venezuelan government forced Rusoro to cede control of all its subsidiaries' assets and operations, without receiving any compensation whatsoever.   Venezuela ultimately gave Rusoro's assets to PDVSA, despite the fact that PDVSA is not a mining company and conducts no mining operations.

42.    On July 17, 2012, Rusoro commenced an arbitration pursuant to the Canada–Venezuela Bilateral Investment Treaty (the "Canada–Venezuela BIT, "BIT," or "Treaty") by filing a Request for Arbitration with the Secretariat of the International Centre for the Settlement of Investment Disputes ("ICSID").   Venezuela had consented to arbitrate its disputes with Rusoro under Article XII(5) of the Canada–Venezuela BIT.

43.    On August 22, 2016, the arbitration tribunal issued a final award (the "Award") and unanimously found that Venezuela had breached the Canada–Venezuela BIT by expropriating Rusoro's investment in Venezuela without payment of compensation.  The Award ordered Venezuela to pay $966,500,000 in compensation for the expropriation and a further $1,277,002 as compensation for a separate breach of the BIT.  Additionally, the Award ordered Venezuela to pay interest from September 16, 2011 until the date of actual payment.  Finally, the tribunal awarded Rusoro $3,302,500 in legal costs associated with the Arbitration.

44.    On August 30, 2016, Rusoro sent a letter to Venezuela demanding satisfaction of the Award.  Venezuela refused to pay the Award.

45.     On December 5, 2017, the Ontario Superior Court of Justice (Canada) granted Rusoro's application seeking recognition of the Award in Canada and entered judgment (the "Canadian Judgment") on the Award.  Venezuela did not appear in opposition to Rusoro's action in the Ontario Court and is now time barred from appealing, or otherwise seeking vacatur of, the Canadian Judgment.

46.     On March 1, 2018, the U.S. District Court for the District of Columbia granted Rusoro's Petition seeking recognition of the Award and entered judgment (the "U.S. Judgment") on the Award in the amount of $967,777,002.00, plus (i) interest as provided by the arbitral tribunal, accruing through the date of the Court's order, (ii) post-judgment interest, pursuant to 28 U.S.C. § 1961, accruing through the date of payment, and (iii) costs as provided by the arbitral tribunal, in the amount of $3,302,500.00.

47.     Venezuela has not satisfied the Canadian Judgment or the U.S. Judgment.  The total amount owed under the U.S. Judgment as of the date hereof is **US$ 1,367,619,574.45** (the "Rusoro Claim").

## B.     CLAIMS BY OTHER CREDITORS AGAINST VENEZUELA MOUNT.

48.     Rusoro was not the only foreign investor to suffer a large scale expropriation at the hands of the Venezuelan government, nor was it the only investor to seek redress and compensation through arbitration.  The most significant government actions affected gold mining and petroleum companies and, between 2007-2016, Venezuela found itself confronted by a series of huge arbitration claims.

49.     On October 21, 2009, Gold Reserve Inc. ("Gold Reserve"), a Canadian gold mining company, commenced an arbitration against Venezuela seeking compensation for Venezuela's expropriation of its gold mining operations in the country.  On September 22, 2014,

the arbitration tribunal awarded Gold Reserve $713,032,000, plus pre-award and post-award interest.

50.    On February 17, 2011, Crystallex International Corporation ("Crystallex"), another Canadian gold mining company, commenced an arbitration against Venezuela, alleging that Venezuela had expropriated its interest in a major mining concession.  On April 4, 2016, the arbitration panel awarded Crystallex $1.2 billion, plus pre-award and post-award interest.

51.    On September 6, 2007, five subsidiaries of Exxon Mobil Corporation ("Exxon") filed for arbitration against Venezuela, seeking compensation for the nationalization of two oil projects in which Exxon had interests.  On October 9, 2014, the arbitral tribunal awarded Exxon $1.6 billion in damages, plus interest.  This amount was subsequently reduced to $189.4 million by an ICSID annulment committee in March 2017.

52.    On November 2, 2007, ConocoPhillips Company and three of its subsidiaries ("ConocoPhillips") filed for arbitration against Venezuela, alleging that Venezuela had expropriated ConocoPhillips' interest in three major oil projects.  ConocoPhillips claimed $30.3 billion in damages, plus interest.  On September 3, 2013, the arbitral tribunal found Venezuela liable for breaching the expropriation provision of the relevant bilateral investment treaty; the issue of damages remains pending.

## C.    VENEZUELA ENGAGED IN A DELIBERATE STRATEGY TO THWART ITS CREDITORS.

53.    While these large claims were pending, Venezuelan government officials, including the country's late former president, Hugo Chávez, announced defiantly that Venezuela would refuse to pay any anticipated arbitral awards against it, and would proactively thwart enforcement of any such awards.  As just one example, President Chávez, in January 2012,

declared that Venezuela "will not recognize any decision" rendered against it, and that Venezuela's award creditors "are trying the impossible: to get us to pay them.  We are not going to pay them anything."[1]

54.    Because CITGO Petroleum represents Venezuela's largest U.S.-based asset, creditors of Venezuela naturally focused on CITGO Petroleum as the means of satisfying the arbitration awards that they sought, and that Venezuela had announced it would refuse to satisfy. As further detailed below, Venezuela attempted to thwart its creditors' attempts to enforce their anticipated judgments by leveraging and monetizing CITGO Petroleum's U.S.-based parent companies (CITGO Holding and PDVH) and funneling that value to Venezuela before creditors could reach it.  In 2014, Venezuelan officials, citing two arbitrations then pending against the state, expressly acknowledged that their decision to monetize PDVSA's subsidiaries in the United States was "motivated by concerns in Caracas that two arbitration panels at the World Bank's International Centre for Settlement of Investment Disputes (ICSID) likely will issue rulings soon ordering [PDVSA] to compensate ConocoPhillips and ExxonMobil for their stakes in Venezuelan integrated Orinoco assets that were nationalized in 2007."[2]

D.    **THE RELATIONSHIP BETWEEN VENEZUELA AND THE ALTER EGO ENTITIES**

1.    **PDVSA is an Alter Ego of Venezuela**

---

[1]    *See* Daniel Wallis, *Venezuela will not recognize World Bank ruling in Exxon case*, REUTERS (Jan. 8, 2012, 8:02 PM), *available at* https://www.reuters.com/article/us-venezuela-exxonmobil/venezuela-will-not-recognize-world-bank-ruling-in-exxon-case-idUSTRE80701V20120109.

[2]    *PdV Weighing Offers to Sell Citgo*, ARGUS MEDIA (July 24, 2014, 1:55 AM), *available at* http://www.argusmedia.com/pages/NewsBody.aspx?id=917546&menu=yes.

55.     While PDVSA was formed as a corporate entity purporting to have legal independence, in reality Venezuela and PDVSA essentially act as a single unit in which PDVSA, the petroleum arm of the Venezuelan government, is dominated and extensively controlled by Venezuela and acts as a ministry or department of the Venezuelan state.

56.     PDVSA was created in accordance with a 1975 Venezuelan statute.   Under Venezuela's "Public Administration Organic Law", Venezuela's National Executive Branch controls PDVSA's activities through "control agencies or entities."[3]   In its Decision 464 of March 18, 2002, Venezuela's Supreme Tribunal of Justice – Constitutional Chamber ruled "there is no doubt" that PDVSA "falls within the framework of the general structure of [the] National Public Administration."[4]   In its Decision No. 281 of February 26, 2007, the same Court recognized that PDVSA enjoys the "privileges" of the Venezuelan state.[5]

57.     Venezuela exerts political and economic control over PDVSA as a matter of law. Article 1 of PDVSA's Articles of Incorporation provide that PDVSA is "a state company . . . created with the form of a commercial company, which shall comply with and execute the hydrocarbons policies dictated by the National Executive . . . in the activities entrusted to it."[6] PDVSA's Articles of Incorporation also provide that the government, as the sole shareholder,

---

[3]     *See* Venezuelan Official Gazette No. 6.147 extraordinary, dated November 17, 2014.

[4]     Constitutional Chamber of the Supreme Tribunal of Justice, Decision No. 464, dated March 18, 2002.

[5]     Constitutional Chamber of the Supreme Tribunal of Justice, Decision No. 281, dated Feb, 26, 2007.

[6]     Venezuelan Official Gazette No. 38.081, dated Dec. 7, 2004.

represents Venezuela in PDVSA's Shareholder Assembly, which is responsible for the "supreme direction and management of the company."[7]

58.     While it is not uncommon for the policies and macro-level decision-making of a state-owned oil company to be influenced by its governmental owner, Venezuela's domination of PDVSA is far more comprehensive, and by virtue of actions taken by Venezuela, PDVSA has been transformed into a virtual department of the state.

59.     Venezuela runs PDVSA on a daily basis.  In its SEC filings and debt offerings, PDVSA admits that "[t]he National Executive . . . regulates and supervises our operations."  The government appoints individuals to serve in the senior positions of PDVSA, and senior officers in the company often have overlapping roles within the Venezuelan government.  By way of example, on November 28, 2017, President Maduro appointed Major General Manuel Quevedo of the Venezuelan Army to serve as both Minister of Petroleum **and** President of PDVSA, an appointment that *Reuters* reported as "giving the already powerful military control of the OPEC nation's dominant industry."   General Quevedo is not the first individual to serve as both Minister of Petroleum and President of PDVSA simultaneously.  For instance, between 2014 and 2017 both of these positions were held by Defendant Pino, who was also simultaneously President of Defendant CITGO Holding and Chairman of its Board.  General Quevedo is one of five current PDVSA Board Members who hold or previously held positions with Venezuelan Government Ministries.  This fact is telling, given that Article 29 of PDVSA's Bylaws prohibits ministers (like General Quevedo) from also serving on the PDVSA Board.[8]

---

[7]     *Id*.

[8]     *See* Venezuelan Official Gazette No. 37.588, dated Dec. 10, 2002, at Art. 29.

60.     PDVSA's senior executive leadership is also dominated by sitting government officials and military officers.  In January 2017, President Maduro simultaneously created a new post of Executive Vice President for PDVSA and filled it with Maribel del Carmen Parra de Mestre, a rear admiral in the Venezuelan Navy.[9]  PDVSA's former Vice President of Finance, Simón Alejandro Zerpa Delgado, was also the president of Fondo Nacional para el Desarrollo Nacional ("FONDEN"),[10] a Venezuelan government "slush fund" that doles out massive welfare benefits within Venezuela, and to which PDVSA is obligated to transfer billions of dollars every year for purposes unrelated to its stated business purpose (oil production).[11]  PDVSA's current Vice President of Finance, Ms. Iliana Ruzza, is also the Vice-Minister of Finance in the Ministry of Economy, Finance and Public Banking of Venezuela.

61.     Shortly after General Quevedo was installed as the Petroleum Minister and President of PDVSA, Venezuela took steps to tighten its control over PDVSA and its affiliated companies.  Specifically, the state promulgated Resolution No. 164, entitled "Regime to Review and Validate National and/or International Contracts Entered Into by PDVSA, its Affiliates and Mixed Companies Where PDVSA Holds Shares."[12]  Under this government regulation, **all** national and international contracts to be signed by PDVSA **and its affiliates** are subject to prior

---

[9]     *See Maduro encomienda a una mujer militar asumir riendas de PDVSA*, PetroGuia (Jan. 30, 2017, 2:15 PM), *available at* http://www.petroguia.com/pub/article/maduro-encomienda-una-mujer-militar-asumir-riendas-de-pdvsa.

[10]    *See*  Cuentasclarasdigital.org News Report, *Conozca a los poderosos nuevos directivos de Pdvsa: Simón Zerpa y Maribel Parra*, *available at*, http://www.cuentasclarasdigital.org/2017/01/conozca-a-los-poderosos-nuevos-directivos-de-pdvsa-simon-zerpa-y-maribel-parra/

[11]    *See* Decree No. 1.359 (Official Gazette No. 40.529 ordinary, dated Oct. 29, 2014).

[12]    Venezuelan Official Gazette 41.294, Resolution No. 164, dated Dec. 6, 2017.

review and validation by General Quevedo, who, as noted above, serves simultaneously as the Minister of Petroleum. Resolution No. 164 provides that "lack of prior review and validation by the Presidency of PDVSA of any contract will affect the existence and/or validity of any contract to be signed . . . ." In other words, the Venezuelan Petroleum Minister is entitled to approve **every contract** entered into by PDVSA both domestically and internationally, as well as any contracts entered into by a PDVSA affiliate, including, *inter alia*, PDVH, CITGO Holding, and CITGO Petroleum. This resolution, by itself, demonstrates Venezuela's day-to-day domination and extensive control over the Alter Ego Entities.

62.     Decree No. 44, issued by President Maduro in April 2018, further consolidated Venezuela's extensive day-to-day control over PDVSA and its affiliates. [13] This decree empowers the Minister of Petroleum to (among other things):

a. create, eliminate, or make changes to state-owned oil companies, including PDVSA and its affiliates;

b. create, eliminate, make changes to, or centralize the bodies that direct, administer, and manage state-owned oil companies;

c. determine, eliminate, make changes to, or centralize the responsibilities, management or procedures in state-owned oil companies;

d. establish general norms that all state-owned oil companies will follow;

e. create, eliminate, make changes to, or centralize procurement committees for state-owned oil companies;

---

[13]  Venezuelan Official Gazette 440.859, Decree No. 44, dated Apr. 12, 2018.

f.   establish procurement norms and procedures for the registration or suspension of

clients and suppliers of state-owned oil companies; and

g.   order the amendment of the by-laws of state-owned oil companies.[14]

63.     Decree No. 44 also specifically provides that the directors and officers of state-owned oil companies "are obliged to carry out the actions required to effectuate the modifications that must be made pursuant to the provisions of this [decree] and pursuant to the instructions issued by the Petroleum Minister."[15]

64.     An agreement establishing a U.S. litigation trust to assert claims of PDVSA arising out of an alleged international bribery scheme further confirms Venezuela's domination and extensive control of PDVSA's assets and decision-making.[16]  The PDVSA U.S. Litigation Trust Agreement dated July 27, 2017 (the "Trust Agreement") recites that it was entered into by PDVSA "acting in this matter through the Minister of the People's Petroleum Power (*i.e.*, the Petroleum Minister) as a representative duly authorized to take action on behalf of PDVSA." The Trust Agreement was executed on behalf of PDVSA by Nelson Martínez, Venezuela's then-Minister of Petroleum.   The trustee appointed by PDVSA, Alexis Arellano Bolívar, is the General Business Manager of the Petroleum Ministry.   The Trust Agreement provides that any decision by the trustees to settle PDVSA's claims must be taken in "consultation with" Venezuela's Attorney General and that any distribution of proceeds to PDVSA is then "subject

---

[14]   Venezuelan Official Gazette 440.859, Decree No. 44, dated Apr. 12, 2018, at Art. 3.

[15]   Venezuelan Official Gazette 440.859, Decree No. 44, dated Apr. 12, 2018, at Art. 3.

[16]   *See* Richard Cooper & Boaz Morag, *The Many Challenges Facing Venezuela Bribery Suit: Part 1*, Apr. 13, 2018, *available at* https://www.law360.com/articles/1032742/the-many-challenges-facing-venezuela-bribery-suit-part-1.

to the approval" of the Attorney General.   Moreover, all notices to PDVSA under the Trust Agreement are to be sent to a legal consultant within the Petroleum Ministry.

65.      While President Maduro's appointment of General Quevedo and Venezuela's issuance of Resolution No. 164 and Decree No. 44 essentially formalized and strengthened the Venezuelan state's complete control over PDVSA, strong evidence of that control had existed previously.  For example:

66.      Venezuela frequently fires or arrests and imprisons officers and employees of PDVSA. President Chavez fired two PDVSA employees on national television, and in 2002 he fired seven PDVSA executives and forcibly retired 12 other employees. The next year, the Venezuelan government fired nearly 40 percent of PDVSA's workforce – approximately 18,000 workers in all – for opposing the government. Between September 2017 and March 2018, the Venezuelan government arrested 80 PDVSA managers.[17]

67.      Venezuela has long exerted substantial economic control over PDVSA.   In particular, Venezuela dictates, through binding legal directives, PDVSA's oil production levels and the prices at which PDVSA may sell oil to certain consumers.  For instance, via Resolution No. 195 (Official Gazette No. 433.107) dated December 20, 2016, the Venezuelan government dictated that PDVSA was to reduce its crude oil production by 95,000 barrels per day.  PDVSA has had to disclose this limitation on its authority in its debt offerings, stating, in one of its offering circulars, that:

---

[17] "Venezuela: High-Level Arrests at PDVSA for Alleged Graft," March 22, 2018, at http://www.poandpo.com/crime/venezuela-highlevel-arrests-at-pdvsa-for-alleged-graft-2232018513/.

> The Venezuelan government, rather than the international market, determines the price of products such as gasoline, diesel, natural gas and natural gas liquids, or NGL, sold by us through our affiliates in the domestic market and, as a result, we earn substantially lower revenues on our products sold in Venezuela than on our exports and products sold internationally. The continued existence of such price controls will continue to reduce our Venezuelan source revenues.[18]

68.     The government-imposed limits on PDVSA's ability to set the prices of the commodities it sells have had a severe impact on PDVSA's cash balances.  Prices for gasoline in the Venezuelan domestic market were as low as $0.015 per liter in 2014 – the lowest rate in the world, with *Reuters* reporting in March 2013 that Venezuela's "fuel subsidy leaves the cost of gasoline and gas oil for power generation at less than 10 cents per gallon, which creates consistent losses for the state oil giant."[19]

69.     Even prior to Venezuela's 2017 consolidation of the Petroleum Ministry and PDVSA, PDVSA acknowledged publicly that its resources were essentially in the service of the state, and that PDVSA's profits were consistently directed toward the government.  For example, in 2016, PDVSA disclosed to its investors that:[20]

    a.   PDVSA could make no assurances "that the government of Venezuela will not require us to increase our financial contributions to social programs."

---

[18]   PDVSA Bond Offering Circular, filed with SEC on Sept. 19, 2016, at 26.

[19]   *Venezuela's PDVSA revenue slips on domestic fuel sales*, REUTERS (Mar. 22, 2013, 4:20 PM), *available at* https://www.reuters.com/article/venezuela-pdvsa/update-2-venezuelas-pdvsa-revenue-slips-on-domestic-fuel-sales-idUSL1N0CEB7U20130322.

[20]   *See* PDVSA Bond Offering Circular, filed with SEC on Sept. 19, 2016, at 28–31, 89.

b.  PDVSA could make no assurances that Venezuela would not "impose further material commitments upon us or intervene in our commercial affairs in a manner that will adversely affect our operations, cash flow and financial results."

c.  PDVSA could "offer no assurance that changes in Venezuelan law or the implementation of policies by the Venezuelan government will not affect our operations, cash flow and financial results."

d.  Venezuela, "as our sole owner, may cause us to pursue certain macroeconomic and social objectives that may adversely affect our results of operations and financial condition."

e.  PDVSA's "Business Plan is based on . . . key initiatives approved by the government of Venezuela."

f.  PDVSA is "controlled by the Venezuelan government, which ultimately determines our capital investment and other spending programs."

g.  The Venezuelan "government requires us to make significant financial contributions to social programs, including transfers to [FONDEN, a national development fund], as well as requiring us to fund specific projects."

h.  The Venezuelan "government may require that we increase our social contribution payments, or it may require us to divert a portion of our crude oil production to electricity companies in Venezuela, which would, in both cases, materially adversely affect our results of operations, cash flows and financial condition."

i.  "The Bolivarian Republic of Venezuela, as our sole owner, has pursued, and may pursue in the future, certain of its macroeconomic and social objectives through us. As a result, we may engage in activities that give preference to the objectives of the

Venezuelan government rather than our economic and business objectives. . . .  For instance, pursuant to the Venezuelan Constitution and the Organic Hydrocarbons Law, we are required to foster Venezuela's socio-economic development and the welfare of its citizens.  To that effect, the government requires us to make significant financial contributions to social programs, including transfers to FONDEN, as well as requiring us to fund specific projects."

70.    As noted by analysts at JPMorgan in a March 2015 report:

> It is difficult to overemphasize the degree to which Venezuela as a sovereign credit and state-oil company PDVSA are intertwined. Venezuela relies on oil for some 97% of its overall exports, and PDVSA produces nearly 100% of all of Venezuela's oil exports. The government take from the oil sector traditionally accounts for about half of budget revenues, while in recent years it has also supported a large (and largely unaccountable) parallel budget. PDVSA's debt strategy has been integrally linked to the government's strategy for its [foreign exchange] regime.  And PDVSA under Chavismo has declared itself "*rojo-rojito*" (redder than red), with an overtly pro-Chavez bent for supporting the government's social, economic and political agenda.

71.    Industry analysts and academic observers have long noted that PDVSA's assets are, for all intents and purposes, Venezuela's, as the state routinely uses PDVSA's assets, without compensation, for state needs.  PDVSA is, in effect, an adjunct to the Venezuelan treasury.  JPMorgan analysts reported in 2015 that "[t]he government in recent years has grown accustomed to taking out over $40 billion per year from PDVSA."  These transfers without fair consideration illustrate Venezuela's domination and extensive control over PDVSA.

72.    As just one example, it is well-established that PDVSA oil is used to satisfy Venezuela's foreign debt to the People's Republic of China, which totals approximately $23 billion.  Venezuela routinely satisfies its debt service on this obligation by ordering PDVSA to

sell millions of barrels of oil to China at below-market prices.  The end result, as noted by academics, is that a large portion of PDVSA's oil exports do not generate cash-flow for PDVSA, but rather are used to make amortized payments to the Chinese government on behalf of the Venezuelan state.

73.    Venezuela is the true beneficiary of PDVSA's conduct in more than just a financial sense.  For instance, Venezuela compels PDVSA to supply oil to several Caribbean states through Petrocaribe, a compact between Venezuela and those states with the stated mission "to promote the social and economic development of the Caribbean."  Through this program, Venezuela commits to supply oil to 17 Caribbean countries at heavily subsidized prices.  The International Monetary Fund has recognized that subsidies provided by PDVSA to the member states in Petrocaribe "have caused PDVSA's capital base to deteriorate and increase[d its] debt levels."

74.    As noted above, PDVSA is legally obligated to channel billions of dollars to FONDEN each year.  For instance, PDVSA is required to contribute to FONDEN its "excess" foreign currency – *i.e.* foreign currency not needed to satisfy any obligations in relation to its foreign investments or needed to be converted into Venezuelan currency for local operational expenses.  In 2016, PDVSA "contributed" $659 million – over 41% of its annual profit – to FONDEN.[21]

75.    PDVSA recently issued its "Strategic Socialist Plan 2016 – 2025."  That document noted that PDVSA should be transformed into a "Socialist and Revolutionary PDVSA."  PDVSA's Strategic Objectives, as listed on its website, include "[s]upport[ing] the

---

[21]    PDVSA Commissioner's Report for Year-End 2016, at 36, 38.

geopolitical positioning of Venezuela internationally."  PDVSA has already been used to pursue state policy ends that are completely unrelated to oil production, including the construction of housing and promotion of agriculture.  PDVSA's involvement in these non-core enterprises are not the result of decisions made by PDVSA to diversify – its involvement has been mandated by the Venezuelan state.

76.     All told, since 2010, PDVSA has contributed approximately $48 billion to non-petroleum related government programs in Venezuela (excluding its contributions to FONDEN).

77.     Finally, as made clear in Paragraphs 175 and 376 of Rusoro's Award, PDVSA was the agent through which Venezuela completed its expropriation of Rusoro's mining investment.  It was PDVSA that took control over the expropriated mining blocks, and it was PDVSA – "acting on behalf of the State" – which ultimately refused to provide Rusoro with compensation.

### 2.     PDVH is an Alter Ego of Venezuela

78.     Venezuela and PDVSA exercise extensive day-to-day control over PDVH, such that PDVH functions as a mere "pass through" entity that Venezuela and PDVSA use to control CITGO Holding and CITGO Petroleum.  In a December 23, 2016 press release, for instance, PDVSA stated that CITGO Petroleum is under PDVSA's "full ownership and control," notwithstanding the fact that CITGO Petroleum is a subsidiary of CITGO Holding, and in turn PDVH.[22]

79.     As noted above, pursuant to Venezuelan government Resolution No. 164 entitled, "Regime to Review and Validate National and/or International Contracts Entered Into by

---

[22] Press Release, PDVSA, "PDVSA Maintains Full Ownership of Citgo," Dec. 23, 2016.

PDVSA, its Affiliates and Mixed Companies Where PDVSA Holds Shares," the Venezuelan government granted to the Presidency of PDVSA – an office occupied by the Minister of Petroleum  – the ability to review and validate all contracts previously entered into by **any PDVSA subsidiary**, including PDVH.[23]  In the event any of these contracts are found lacking, the Venezuelan government is empowered  to take "necessary corrective actions."[24]

80.    Resolution No. 164 also empowers the Presidency of PDVSA (and thus Venezuela) to establish new levels of administrative and financial authority within all PDVSA affiliates, including PDVH.  The resolution holds that the pre-existing "internal delegation" regime prevailing within these subsidiaries is "without legal effect."[25]  In other words, the Venezuelan government, through issuance of a resolution and without regard for corporate formalities, unilaterally modified the corporate governance structure of PDVH, a corporation that it does not directly own, and that is organized and exists under, and that is subject to, Delaware law.

81.    Venezuela's promulgation of Decree No. 44 in April 2018 consolidated its extensive day-to-day control over its state-owned oil companies, including PDVH, by granting the Petroleum Minister extraordinary powers to intervene directly in the management of these companies.  For example, Decree No. 44 empowers the Petroleum Minister to (1) create procurement committees for state-owned oil companies, (2) establish procedures for the

---

[23]    Venezuelan Official Gazette No. 41.294, Resolution No. 164, dated Dec. 6, 2017, at Art. 3.

[24]    *Id*.

[25]    *Id*. at Art. 8.

registration or suspension of clients and suppliers of state-owned oil companies, and (3) order the amendment of the by-laws of state-owned oil companies.[26]

82.     PDVH's directors have extensive ties to PDVSA and Venezuela and hold parallel positions in PDVSA management.  For instance, Defendants Chacin and Luongo, who at all relevant times served as directors of PDVH, simultaneously served as both officers and directors of PDVSA.  Similarly, Defendant Castillo, who also served at all relevant times as director of PDVH, simultaneously served as President of PDVSA Gas, S.A. (a wholly-owned subsidiary of PDVSA) and as director of PDVSA.

83.     As more fully explained herein, PDVH entered into a number of financial transactions which provided it no benefit, but which resulted in the transfer of billions of dollars and other value to PDVSA, where they are, in effect, available for Venezuela's use.  These actions, which were part of a scheme to hinder, delay, or defraud creditors like Rusoro, illustrate the domination and extensive control that PDVSA and Venezuela have over PDVH, making PDVH an alter ego of PDVSA and Venezuela.

**3.     <u>CITGO Holding is an Alter Ego of Venezuela</u>**

84.     Venezuela and CITGO Holding act as a single economic unit in which CITGO Holding is dominated and extensively controlled by Venezuela.

85.     Venezuela has complete legal control of CITGO Holding because it owns 100 percent of CITGO Holding through PDVSA and PDVH.  As CITGO Holding's sole shareholder, PDVH, acting at the direction of Venezuela and/or PDVSA, appoints CITGO Holding's directors.

---

[26]   Venezuelan Official Gazette 440.859, Decree No. 44, dated Apr. 12, 2018, at Art. 3.

86.     As with PDVH, CITGO Holding's directors and officers have extensive ties to PDVSA and Venezuela and hold parallel positions in PDVSA management or with the Venezuelan government.  For instance, Defendant Pino, who at all relevant times served as CITGO Holding's President and Chairman of its Board of Directors, simultaneously served as President of PDVSA **and** Venezuela's Minister of Petroleum. Defendants Chacin and Luongo, who served as directors of CITGO Holding at all relevant times, also simultaneously served as both officers and directors of PDVSA and as directors of PDVH.

87.     Venezuela's leverage over officers of CITGO Holding has not been merely theoretical. As indicated above, President Maduro removed defendant Pino, CITGO Holding's President and Chairman, from his positions with PDVSA and CITGO Holding on November 28, 2017 and replaced him with General Quevedo. Two days later, armed, hooded government agents stormed Pino's home before dawn and abducted him. The former CITGO Holding chairman is in jail awaiting trial.

88.     Venezuela and PDVSA exercise extensive day-to-day control over CITGO Holding, directly and through PDVH, such that CITGO Holding may also be characterized as a mere "pass through" entity that Venezuela and PDVSA use to control CITGO Petroleum.  In a December 23, 2016 press release, PDVSA made clear that CITGO Petroleum is under PDVSA's "full ownership and control," despite the fact that it is nominally owned by CITGO Holding.[27]

89.     As noted above, Resolution No. 164 (a) vests the Venezuelan government (through the Presidency of PDVSA, which office is occupied by the Minister of Petroleum) with the ability to review and validate all contracts previously entered into by any PDVSA subsidiary,

---

[27] Press Release, PDVSA, "PDVSA Maintains Full Ownership of Citgo," Dec. 23, 2016.

including CITGO Holding, and (b) invalidated, without regard to corporate formalities, the corporate governance structure of CITGO Holding.  In other words, the Venezuelan government, through issuance of a resolution and without regard for corporate formalities, unilaterally abolished the duly-established corporate governance structure of CITGO Holding, a corporation organized and existing under Delaware law. Decree No. 44 consolidated Venezuela's extensive control over CITGO Holding by empowering the Petroleum Minister to intervene directly in the day-to-day management of the company.

90.     CITGO Holding has acknowledged that it is subject to PDVSA's domination and extensive control in its bond offering circulars, and specifically identified the control exercised by PDVSA and Venezuela as a significant risk factor that might adversely affect the value of its bonds for creditors.  For instance, a bond offering circular issued in connection with a 2015 bond offering warned, "[n]o assurance can be given that the Bolivarian Republic of Venezuela, as PDVSA's shareholder, will not adopt policies or exercise its control of PDVSA in a manner that might adversely affect [CITGO Holding bondholders'] interests."  CITGO Holding went on to warn that "PDVSA could at any time in the future conduct other processes or undertake one or more transactions to monetize its interests in us, and any such process could be undertaken or any such transaction could occur at a time when it would be beneficial to PDVSA but could have a negative impact on [CITGO Holding's] business and operations."[28]

91.     Notably, these statements make no mention of PDVH, CITGO Holding's direct corporate parent, underscoring that entity's status as a "pass-through" structure used by PDVSA to carry out its activities within the United States.

---

[28]   CITGO Holding, Inc. Preliminary Offering Memorandum dated Jan. 28, 2015, at 11.

92.     Venezuela's domination and extensive control of CITGO Holding is clearly evidenced by CITGO Holding's issuance of the 2015 Dividend, described below.

**4.     CITGO Petroleum is an Alter Ego of Venezuela**

93.     Venezuela, through PDVSA, dominates and controls CITGO Petroleum.  In a December 23, 2016 press release, PDVSA confirmed its domination and extensive control of CITGO Petroleum: "Petróleos de Venezuela, S.A. (PDVSA) maintains full ownership and control over Citgo Petroleum Corporation, its subsidiary in the United States." (emphasis added).

94.     All three members of CITGO Petroleum's board of directors also serve on PDVSA's board of directors and serve in other capacities for PDVSA.  Nelson Ferrer is Vice President for Exploration and Production, Guillermo Blanco is Vice President of Refining, and Ysmel Serrano is Vice President of Trade and Supply.

95.     Prior to that, three of the four members of CITGO Petroleum's board of directors had served as both officers and directors at PDVSA: Sergio Antonio Tovar as Director of Planning, Jesus Luongo as Vice President of Refining, Trade and Supply, and Anton Castillo as President.  The fourth board member, former CITGO Petroleum President and Chief Executive Officer Nelson Martinez, assumed his position at CITGO Petroleum in 2013 after a 33-year career at PDVSA. On information and belief, others, including Eudomario Carruyo and Dester Rodriguez, have served simultaneously as directors of PDVSA and CITGO Petroleum.

96.     PDVSA is using CITGO Petroleum in the United States as its procurement and accounts payable agent and to pay its own commercial debts.  PDVSA is also using CITGO Petroleum's assets in the United States for its own benefit without transferring any value to CITGO Petroleum.  Defendant Pino, Venezuela's former Petroleum Minister and President of

PDVSA and CITGO Holding, confirmed that "we are using [CITGO Petroleum] refineries in the United States to financially support PDVSA."

97.      For example, PDVSA has transferred its obligations, under a purchase agreement with BP, to CITGO Petroleum. *Reuters* reported that PDVSA caused CITGO Petroleum to begin paying BP for accounts payable that PDVSA incurred in relation to one of its contracts to purchase light crude from BP.[29] *Reuters* stated that they had access to copies of "bank transfer vouchers" related to payments by CITGO Petroleum to BP on at least two PDVSA invoices totaling $43.7 million. *Reuters* stated further that its investigation of the payments by CITGO Petroleum (as PDVSA's agent) to BP were based on internal "communiques" in which PDVSA acknowledged that "its cashflow woes were causing logistics problems." Upon information and belief, PDVSA personnel communicated with CITGO Petroleum personnel in the United States through these communiques and directed CITGO Petroleum to pay BP directly. According to the *Reuters* news article, "[t]o help with the import costs, PDVSA turned to its unit in the United States, Citgo Petroleum, to pay two invoices to BP for a total of $43.7 million, according to bank transfer vouchers seen by Reuters."

98.      Upon information and belief, PDVSA has used CITGO Petroleum as a procurement and payment agent on many purchases and leases in the United States and elsewhere, including purchases and/or leases of aircraft, power generators, and mechanical components for vessels. Upon information and belief, PDVSA did not even attempt to account

---

[29]  Marianna Parraga, *Exclusive: PDVSA payment woes drive up bill for big oil buy from BP – internal documents*, REUTERS (Sept. 13, 2016, 8:08 AM), *available at* https://www.reuters.com/article/us-venezuela-usa-crude/exclusive-pdvsa-payment-woes-drive-up-bill-for-big-oil-buy-from-bp-internal-documents-idUSKCN11J1DP?type=companyNews.

for or compensate CITGO Petroleum for these purchases and/or leases because PDVSA regarded and deployed CITGO Petroleum's assets as its own.

99.     Over the past few years PDVSA has also transferred its obligations under other purchase agreements to CITGO Petroleum, including purchase agreements with Cameron (a Schlumberger subsidiary in Houston, Texas) and General Electric.  Upon information and belief, PDVSA caused CITGO Petroleum to assume these obligations for nothing in return.

100.    Also in February 2016, PDVSA reportedly tapped into CITGO Petroleum's credit line in the United States to finance the import of light crude and refined products to Venezuela.  As reported in *Argus Media*, CITGO Petroleum's credit line was "one of several alternatives [PDVSA] is pursuing to get around suppliers' requirements for up-front cash payment."[30]

101.    According to a May 25, 2017 report from *Bloomberg*, PDVSA and Venezuelan government officials are using CITGO Petroleum as part of a scheme to purchase crude oil from Syria for CITGO Petroleum's refinery in Aruba, which would then be re-sold into the United States in order to circumvent U.S. sanctions against Syria.[31]  According to that report, the "previously undisclosed plan aimed to sell Syrian oil at a big discount to Venezuela through a Russian shell company, which would send it to Aruba for refining and distribution to gas stations in the U.S. and elsewhere, according to dozens of emails, documents and interviews."  That same

---

[30]     *PdV taps Citgo credit line for oil imports*, ARGUS MEDIA (Feb. 4, 2016, 8:26 PM), *available at* http://www.argusmedia.com/pages/NewsBody.aspx?id=1182175&menu=yes.

[31]     Ben Bartenstein, *Venezuela Secretly Plotted to Sell Banned Syrian Oil to the U.S.*, BLOOMBERG (May 25, 2017, 5:00 AM), *available at* https://www.bloomberg.com/news/articles/2017-05-25/venezuela-s-secret-plot-to-sell-banned-syrian-oil-in-u-s-market.

report also stated that communications exist "between Syrian and Venezuelan officials that included several executives of Houston-based Citgo Petroleum Corp., the U.S. subsidiary of PDVSA . . . ."

E.      THE 2015 DIVIDEND

102.     Confronted with billions of dollars of creditor claims against it, Venezuela first attempted to liquidate CITGO Petroleum by selling the company outright.  In 2014, news outlets reported that CITGO Petroleum was being offered for sale.  Venezuela and PDVSA failed to attract a suitable buyer, however, so Venezuela called off the sale in late 2014.

103.     Venezuela then developed an alternative scheme to convert the Alter Ego Entities' assets—including equity, refineries, plants, and distribution assets—to cash and then repatriate the cash to Venezuela before it could be seized in the United States by Venezuela's creditors, like Rusoro.  This alternate scheme involved using CITGO Holding to borrow billions of dollars, for no legitimate business purpose, and immediately transfer the loan proceeds through PDVH and PDVSA to Venezuela through a series of "dividends" (the "2015 Dividend"). Specifically, PDVH, which upon information and belief was acting at PDVSA's and Venezuela's direction, and for Venezuela's ultimate benefit, caused CITGO Holding to borrow $2.8 billion,[32] first by issuing $1.5 billion worth of high-yield bonds, and then entering into a $1.3 billion loan

---

[32] According to the offering documents and PDVSA's financial statements, the revenue attributed to CITGO Petroleum represented almost one third of PDVSA's consolidated revenue for the year ending December 31, 2013 ($42.254 billion of $134.326 billion).  The same documents also show that CITGO Petroleum's assets represented about 26.5% of PDVSA's total refining capacity at the end of 2013 (749 thousand barrels per day of 2,822 thousand barrels per day).

facility. CITGO Holding then immediately declared a dividend, and paid the full amount of the loan proceeds to PDVH.

104.    Upon information and belief, PDVSA retained Deutsche Bank Securities, Inc. ("Deutsche Bank") in New York as its agent to facilitate this transaction and to assist it with other efforts to liquidate assets.  For example, PDVSA had also retained Deutsche Bank to market its 50% interest in a refinery in Chalmette, Louisiana.  Upon information and belief, PDVSA communicated its instructions relating to this transaction to Deutsche Bank through telephone calls and emails to the United States and in meetings in the United States.

105.    PDVSA also retained the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP to execute this transaction.  Upon information and belief, PDVSA communicated its instructions to said law firm through telephone calls and emails to the United States and in meetings in the United States.

106.    Moreover, PDVSA's personnel participated in and directed, directly and through telephone calls, the presentations and negotiations in the United States relating to this transaction.

107.    PDVSA's personnel traveled to the United States to take part in meetings and negotiations relating to this transaction.  For example, upon information and belief, Jesus Luongo (PDVSA's Vice President of Refining) met with CITGO Petroleum executives in the United States, including Nelson Martinez, and directed Mr. Martinez to provide information to Deutsche Bank for use in facilitating this transaction.

108.    Venezuelan state officials and PDVSA's personnel communicated by telephone with CITGO Petroleum personnel and Deutsche Bank in the United States and directed this transaction.  For example, upon information and belief, General Rodolfo Marco Torres (a

director of PDVSA and a Venezuelan government minister) often called Nelson Martinez (then-head of CITGO Petroleum) and Jose Pereira (CITGO Petroleum's then-vice president of finance) with instructions regarding this transaction. During one of these telephone calls, General Torres reportedly instructed Mr. Martinez, who was in New York, to have CITGO Holding pledge its interest in CITGO Petroleum as collateral for this transaction. Upon information and belief, this telephone call conversation happened immediately before Mr. Martinez met with advisors (or potential advisors) regarding this transaction.

109.   The result of this orchestrated scheme was that CITGO Holding was effectively looted by incurring $2.8 billion in debt for no legitimate business purpose, and immediately transferring the loan proceeds as an illegal dividend to PDVH.

110.   PDVH, upon receiving the proceeds of the CITGO Holding dividend, also declared a dividend, and up-streamed the $2.8 billion to PDVSA. This second dividend moved the funds out of the United States and beyond the reach of U.S. creditors, while making those funds available for use by Venezuela.

111.   The result of the 2015 Dividend was that Venezuela pulled in almost $3 billion that likely would have been attached by its creditors. PDVH was looted because its principal asset (*i.e.*, its equity in CITGO Holding) was substantially devalued by the incurrence of CITGO Holding debt and the wrongful dividend of the loan proceeds ultimately to PDVSA and Venezuela.

112.   At all relevant times, CITGO Holding and PDVH were insolvent or rendered insolvent by this transaction. CITGO Holding and PDVH had insufficient assets to satisfy their debts, including but not limited to claims of Rusoro and other similarly-situated creditors whose assets had been expropriated by Venezuela in violation of international law.

113.    An offering circular issued by PDVSA on September 19, 2016 purported to show that CITGO Holding had total shareholder's equity of $357.4 million as of December 31, 2015.[33] Upon information and belief, however, that equity value was premised on a vast over-valuation of CITGO Petroleum.  Once properly adjusted, CITGO Holding was insolvent prior to or was rendered insolvent by the improper 2015 Dividend.

114.    The $2.8 billion dividend payment from CITGO Holding to PVDH, and then from PDVH to PDVSA, necessitated action by PDVSA in the United States—*i.e.*, PDVSA, acting on behalf of and in accordance with instructions from the Venezuelan government, acted through its agents serving on the boards of CITGO Holding and PDVH.  The decision to issue a dividend or to undertake a fundamental corporate transaction must be authorized by a company's board of directors under Delaware law.

115.    The Individual Defendants helped effectuate this improper scheme to hinder, delay or defraud Plaintiff by approving, through their positions as directors and officers of PDVH and CITGO Holding, the transactions resulting in the 2015 Dividend.  In doing so, they breached their duty of loyalty and their duty of care.  The Individual Defendants caused PDVH and CITGO Holding to enter into intercompany transfers without consideration which substantially undermined their financial viability.  Upon information and belief, the Individual Defendants followed the instructions of Venezuela and PDVSA in approving an unlawful dividend of the loan proceeds for the improper purpose of hindering, delaying, or defrauding creditors like Rusoro.  Moody's, the rating agency, has described PDVH as "lack[ing] an independent board," "control[led]" by and "entirely subject to [PDVSA's] direction."

---

[33]    PDVSA Bond Offering Circular, filed with SEC on Sept. 19, 2016, at A-83.

116.    The transaction that comprised the 2015 Dividend constituted commercial activity that took place, at least in significant part, in the United States.  The Alter Ego Entities and the Individual Defendants took acts in furtherance of this transaction while in the United States, including, *inter alia*, from their corporate offices in Houston, Texas.

117.    All of the steps in this coordinated fraudulent transfer were part of a single scheme, wherein the Alter Ego Entities acted as agents of Venezuela.  The net result of these transactions was that CITGO Holding incurred a $2.8 billion debt that it could not afford, while immediately sending the $2.8 billion in loan proceeds to Venezuela as "dividends," thus placing them beyond the reach of Venezuela's creditors.

118.    In recognition of the fraudulent nature of the 2015 Dividend, on August 24, 2017, President Trump signed Executive Order No. 13808 (the "Executive Order"), which prohibited Venezuelan-owned companies, including CITGO Petroleum, CITGO Holding, and PDVH, from making dividend distributions to the Venezuelan government.  The executive order defined "Government of Venezuela" to include "PdVSA, and any person owned or controlled by, or acting for or on behalf of, the Government of Venezuela."[34]

119.    The 2017 Executive Order clearly reflects the impropriety of the 2015 Dividend, and further underscores why the transaction should be unwound and those who facilitated it be held liable for their actions.

---

[34] Latham & Watkins Client Alert, *The Trump Administration's New Venezuela Sanctions: Top 10 Takeaways*, Aug. 29, 2017, at 2, *available at* https://m.lw.com/thoughtLeadership/LW-The-Trump-Administrations-New-Venezuela-Sanctions-Top-10-Takeaways; *see also* Press Release, The White House, "Statement by Press Secretary on New Financial Sanctions on Venezuela," Aug. 25, 2017; Executive Order No. 13808 of August 24, 2017, 82 Fed. R. 41155, *available at* https://www.gpo.gov/fdsys/pkg/FR-2017-08-29/pdf/2017-18468.pdf.

**F.      THE 2016 BOND SWAP**

120.     Despite having been named defendants in a fraudulent transfer suit in November 2015 resulting from the 2015 Dividend, the Alter Ego Entities, at the direction of Venezuela, continued to pursue additional improper schemes to repatriate the value of Venezuela's remaining U.S.-based assets in order to shield them from Venezuela's creditors.

121.     In October 2016, PDVSA restructured its outstanding debt using PDVH's stock in CITGO Holding as collateral.  Specifically, PDVSA offered up to 1.22 times the face value of its existing bonds maturing in 2017 in exchange for higher interest, longer term notes maturing in 2020.  The kicker was that these 2020 bonds would be secured by new collateral: a 50.1% interest in PDVH's stock in CITGO Holding.  In other words, bondholders holding $2.8 billion worth of PDVSA bonds tendered their notes for approximately $3.367 billion worth of new notes secured by a 50.1% interest in the stock of CITGO Holding (the "2016 Bond Swap").[35]  Upon information and belief, PDVH's board of directors approved PDVH's pledge of its 50.1% equity stake in CITGO Holding by unanimous written consent and submitted their approvals to PDVH's offices in the United States or to PDVH's legal counsel in the United States.  Upon information and belief, PDVH did not receive any value, much less reasonably equivalent value, in exchange for its pledge of a majority interest in its primary asset.  This was not an arms-length transaction and was only done because Venezuela and PDVSA exercised their domination and extensive control over PDVH and the PDVH Individual Defendants.  PDVH granted the liens for the sole benefit of PDVSA and Venezuela. PDVSA, PDVH, and Venezuela acknowledged that

---

[35] PDVSA retained the D.F. King & Co., Inc. as its information and exchange agent for this transaction.

the 2016 Bond Swap appeared fraudulent.  The offering circular for the 2016 Bond Swap explicitly warned that "PDVSA cannot guarantee that a creditor of the Bolivarian Republic of Venezuela will not be able to interfere with the Exchange Offers, the Collateral or payments made under the New Notes, through an attachment of assets, injunction, temporary restraining order or otherwise."[36]

122.     PDVH's pledge of its stock in CITGO Holding severely damaged PDVH's own interests by putting CITGO Petroleum and CITGO Holding at risk of a default on CITGO Petroleum's debt.  According to the *Financial Times*, "If PDVSA defaults on the new bonds then investors can seize 50.1 per cent of the US petrol company, but this would trigger a 'change-of-control' clause in Citgo's own $5bn of debt, making it immediately payable."[37]  In other words, if the lien on PDVH's shares of CITGO Holding is ever exercised, it will destroy the value of CITGO Petroleum, the ultimate driver of PDVH's net worth.  Yet this did not stop PDVH from agreeing to offer its assets for no legitimate corporate purpose solely to benefit PDVSA and, ultimately, Venezuela.

123.     The fact that PDVH and the PDVH Individual Defendants executed this improper transaction demonstrates the domination and extensive control that PDVSA and Venezuela have over them.  In short, the 2016 Bond Swap demonstrates that PDVH is an alter ego of PDVSA and Venezuela. The transaction was part of a scheme orchestrated by Venezuela and PDVSA with  actual intent to delay, hinder, or defraud creditors like Rusoro.

---

[36]  PDVSA Bond Offering Circular, filed with SEC on Sept. 19, 2016, at 121.

[37]  Robin Wigglesworth & Andres Schipani, *Venezuelan oil major's debt swap: the beginning of the end?*, The Financial Times (Sept. 26, 2016), *available at* https://www.ft.com/content/aadf657c-7f4a-11e6-8e50-8ec15fb462f4.

124.     This transaction constituted commercial activity that took place, at least in significant part, in the United States.  For instance, as part of the transaction PDVSA engaged The Depository Trust Company ("DTC"), a New York trust company, to serve as the Depository for the 2020 bonds it was issuing, and indicated in the accompanying offering circular that it would "apply to DTC for acceptance of the [bonds] in its book-entry settlement system."[38] PDVSA gave investors the option to "elect to hold interests in the [bonds] through the Depository," or through two European banking services who separately engaged two New York-based banks (Citibank N.A. and JPMorgan Chase Bank) to act as depositaries.[39]  Consequently, U.S.-based activity was integral to the execution of the 2016 Bond Swap.

125.     This transaction constituted commercial activity that took place, at least in significant part, in the United States.  Upon information and belief, the Alter Ego Entities and the Individual Defendants took acts in furtherance of this transaction while in the United States, including, *inter alia*, from their corporate offices in Houston, Texas.

## G.     THE 2016 PLEDGE OF THE BALANCE OF THE CITGO HOLDING STOCK

126.     On November 30, 2016, Defendants – now facing **three** separate fraudulent transfer lawsuits in the United States – completed an additional fraudulent transaction by mortgaging the remaining 49.9% of PDVH's stock in CITGO Holding that had not been pledged to PDVSA's bondholders the month before.

127.     PDVSA (for the ultimate benefit of Venezuela) obtained a $1.5 billion financing from Rosneft Trading, S.A., which was collateralized by PDVH's remaining 49.9% equity

---

[38]     PDVSA Bond Offering Circular, filed with SEC on Sept. 19, 2016, at 167.

[39]     PDVSA Bond Offering Circular, filed with SEC on Sept. 19, 2016, at 167.

interest in CITGO Holding that had not been pledged.  Upon information and belief, the stock pledge was not an "arms-length" transaction and PDVH did not receive any value, much less reasonably equivalent value, in return for the pledge.   Upon information and belief, the transaction was done at the direction of Venezuela and PDVSA, and the net effect was to improperly transfer value from PDVH, through the stock pledge, out of the United States and to Venezuela.  All of this was done as part of an orchestrated scheme to hinder, delay or defraud creditors like Rusoro.

128.    The improper collateralization of PDVH demonstrates the domination and extensive control that Venezuela and PDVSA exercise over PDVH and why PDVH is an alter ego of Venezuela and PDVSA.  The PDVH Individual Defendants breached their duties of loyalty and care in agreeing to collateralize their primary asset without receiving any value.  The effect of this transaction was to move $1.5 billion of value to Venezuela at the expense of PDVH.

129.    After this transaction closed, PDVSA stated that it had "used" its Delaware subsidiaries as its agents to accomplish both this transaction and the 2016 Bond Swap.  In a December 23, 2016 press release, PDVSA summarized the effect of the 2016 fraudulent transfers as such: "Just as PDVSA leveraged itself in October using as collateral 50.1% of Citgo for the bond swap operation, in the midst of attacks against the company and a downturn in the global oil industry, it has used the remaining 49.9% [of equity in CITGO Holding] to raise new financing." This press release also confirmed PDVSA's domination and control over PDVH and CITGO Holding stating: "Petróleos de Venezuela, S.A. (PDVSA) maintains **full ownership and control** over Citgo Petroleum Corporation, its subsidiary in the United States." (emphasis

added).  Significantly, no mention was made of PDVH or CITGO Holding, the two intermediary subsidiaries.[40]

130.    This transaction constituted commercial activity that took place, at least in significant part, in the United States.  Upon information and belief, the Alter Ego Entities and the Individual Defendants took acts in furtherance of this transaction while in the United States, including, *inter alia*, from their corporate offices in Houston, Texas.

**FIRST CAUSE OF ACTION**
**Declaratory Judgment – Alter Ego**
**(PDVSA)**

131.    Rusoro repeats and realleges the allegations in paragraphs 1 through 130 as if set forth fully herein.

132.    Venezuela is the 100% owner of PDVSA.

133.    Many of PDVSA's executives, including its president, are sitting government officials.

134.    Venezuela routinely uses PDVSA's assets as if they were its own.

135.    Venezuela has unfettered legal authority and ability to direct, and has directed, the use of PDVSA assets for its own purposes, regardless of whether those purposes are consistent with PDVSA's interests or business purposes.

136.    Recently-promulgated government decrees render all of PDVSA's actions subject to approval by, and voidable at the election of, Venezuela and in Venezuela's sole discretion.  The result of these decrees is that PDVSA operates as a department or ministry of the Venezuelan state, rather than as an instrumentality entitled to juridical independence.

---

[40]    Press Release, PDVSA, "PDVSA Maintains Full Ownership of Citgo," Dec. 23, 2016.

137.     Venezuela's domination and extensive control of PDVSA is also demonstrated by its arrest of 80 PDVSA managers between September 2017 and March 2018. The arrested managers included PDVSA's President, defendant Pino, who was abducted by armed, hooded government agents on November 30, 2017.

138.     PDVSA is so extensively controlled by Venezuela that, for purposes of the actions at issue herein, PDVSA has acted at all times as Venezuela's agent.

139.     Because Venezuela has used PDVSA as its agent to execute a series of fraudulent transactions that had no legitimate business purpose and were designed to hinder creditors from enforcing judgments against Venezuela in the United States, recognizing PDVSA's juridical independence would work a fraud or injustice against Venezuela's creditors.

## SECOND CAUSE OF ACTION
### Declaratory Judgment – Alter Ego
### (PDVH)

140.     Rusoro repeats and realleges the allegations in paragraphs 1 through 139 as if set forth fully herein.

141.     PDVSA, Venezuela's alter ego, owns 100% of PDVH.

142.     Venezuela and PDVSA ignore corporate formalities in their dealings with PDVH and its subsidiaries.

143.     At all relevant times, all of PDVH's directors also served as directors and officers of PDVSA and/or PDVSA Gas, S.A. (a wholly-owned subsidiary of PDVSA).

144.     Venezuela, through its agent, PDVSA, treats PDVH's property as if it were its own.

145.     Venezuela, acting through its agent, PDVSA, has unfettered legal authority and ability to direct, and has directed, the use of PDVH assets for its own purposes, regardless of whether those purposes are consistent with PDVH's interests or business purposes.

146.     Recently-promulgated government decrees render all of PDVH's actions subject to approval by, and voidable at the election of, Venezuela and in Venezuela's sole discretion.

147.     Upon information and belief, Venezuela directed PDVH to mortgage its primary asset—the equity in CITGO Holding—in order to repatriate the value of that asset and prevent it from being attached and/or executed by Venezuela's creditors.

148.     PDVH is so extensively controlled by Venezuela, through its agent, PDVSA, that a relationship of principal and agent has arisen between Venezuela and PDVH, whereby PDVH acts as Venezuela's agent.

149.     Because Venezuela has, through its agent, PDVSA, used PDVH as its agent to execute a series of fraudulent transactions that had no legitimate business purpose and were designed to hinder creditors from enforcing judgments against Venezuela in the United States, recognizing PDVH's juridical independence would work a fraud or injustice against Venezuela's creditors.

**THIRD CAUSE OF ACTION**
**Declaratory Judgment – Alter Ego**
**(CITGO Holding)**

150.     Rusoro repeats and realleges the allegations in paragraphs 1 through 149 as if set forth fully herein.

151.     Venezuela, through its agents PDVSA and PDVH, owns 100% of CITGO Holding.

152.    Many of CITGO Holding's directors and officers also serve as officials of PDVSA and/or Venezuela.

153.    Venezuela, acting through its agents, PDVSA and PDVH, treat CITGO Holding's property as if it were its own.

154.    Venezuela, acting through its agents, PDVSA and PDVH, has unfettered legal authority and ability to direct, and has directed, the use of CITGO Holding's assets for its own purposes, regardless of whether those purposes are consistent with CITGO Holding's interests or business purposes.

155.    Recently-promulgated government decrees render all of CITGO Holding's actions subject to approval by, and voidable at the election of, Venezuela in Venezuela's sole discretion.

156.    Upon information and belief, Venezuela directed CITGO Holding to issue $2.8 billion in bonds and to deliver the cash proceeds of the bond issue to Venezuela through its intermediaries, PDVH and PDVSA.

157.    CITGO Holding is so extensively controlled by Venezuela, through its agents, PDVSA and PDVH, that a relationship of principal and agent has arisen between Venezuela and CITGO Holding, whereby CITGO Holding acts as Venezuela's agent.

158.    Because Venezuela has, through its agents PDVSA and PDVH, used CITGO Holding as its agent to execute a series of fraudulent transactions that had no legitimate business purpose and were designed to hinder creditors from enforcing judgments against Venezuela in the United States, recognizing CITGO Holding's juridical independence would work a fraud or injustice against Venezuela's creditors.

**FOURTH CAUSE OF ACTION**
**Declaratory Judgment – Alter Ego**
**(CITGO Petroleum)**

159.    Rusoro repeats and realleges the allegations in paragraphs 1 through 158 as if set forth fully herein.

160.    Venezuela, through its agents PDVSA, PDVH, and CITGO Holding, owns 100% of CITGO Petroleum.

161.    Many of CITGO Petroleum's directors and officers also serve as officials of PDVSA and/or Venezuela.

162.    Venezuela, acting through its agents, PDVSA, PDVH, and CITGO Holding, treats CITGO Petroleum's property as if it were its own.

163.    Venezuela, acting through its agents, PDVSA, PDVH, and CITGO Holding, has unfettered legal authority and ability to direct, and has directed, the use of CITGO Petroleum's assets for its own purposes, regardless of whether those purposes are consistent with CITGO Petroleum's interests or business purposes.

164.    Recently-promulgated government decrees render all of CITGO Petroleum's actions subject to approval by, and voidable at the election of, Venezuela in Venezuela's sole discretion.

165.    Venezuela, through its agent PDVSA, uses CITGO Petroleum as a procurement and payment agent to pay off certain of PDVSA's commercial debts.

166.    CITGO Petroleum is so extensively controlled by Venezuela, through its agents, PDVSA, PDVH, and CITGO Holding, that a relationship of principal and agent has arisen between Venezuela and CITGO Petroleum, whereby CITGO Petroleum acts as Venezuela's agent.

167.     Because Venezuela has, through its agents PDVSA, PDVH, and CITGO Holding, used CITGO Petroleum as its agent to execute a series of fraudulent transactions that had no legitimate business purpose and were designed to hinder creditors from enforcing judgments against Venezuela in the United States, recognizing CITGO Petroleum's juridical independence would work a fraud or injustice against Venezuela's creditors.

**FIFTH CAUSE OF ACTION**
**Fraudulent Transfer (Actual Fraud) – 2015 Dividend**
**(Venezuela, PDVSA, PDVH, CITGO Holding)**

168.     Rusoro repeats and realleges the allegations in paragraphs 1 through 167 as if set forth fully herein.

169.     The Texas Uniform Fraudulent Transfer Act (TUFTA), TEX. BUS. & COM. CODE § 24.001 *et seq.*, provides that a transfer made or obligation incurred by a debtor is "fraudulent" as that term is used in TUFTA, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor, *id.* at § 24.005(a)(1).

170.     This cause of action arises under Texas law because most of the acts and events giving rise to this cause of action occurred in Texas, the principal place of business of PDVH, CITGO Holding, and CITGO Petroleum.   In the alternative, should the Court conclude that Delaware law applies, Rusoro asserts this cause of action under the Delaware Uniform Fraudulent Transfer Act (DUFTA), 6 DEL. CODE § 1301 *et seq.*

171.     During the pendency of Rusoro's arbitral proceedings against Venezuela, Venezuela knew and/or anticipated that Rusoro (and other actual or contingent creditors who were prosecuting arbitration claims against Venezuela) would obtain an arbitral award against Venezuela.  As a result, Venezuela announced that it would attempt to sell or liquidate CITGO

Petroleum and transfer the proceeds outside the United States in order to prevent Venezuela's creditors from seizing CITGO Petroleum's assets in the United States.

172.     Consistent with this announcement, the Alter Ego Entities, acting as Venezuela's agents and under Venezuela's direction, and in Venezuela's sole interest, orchestrated a scheme whereby PDVSA and PDVH caused CITGO Holding to borrow $2.8 billion, which was immediately paid as a "dividend" by CITGO Holding to PDVH, which then immediately paid the proceeds to PDVSA as a "dividend."  Once these funds were received by PDVSA, they were in the constructive possession of Venezuela, and Venezuela was capable of accessing and using them.  This transaction has several badges of fraud:

    a.  The 2015 Dividend proceeds were transferred from CITGO Holding to PDVH, which controls CITGO Holding and is thus an "insider."

    b.  The 2015 Dividend proceeds were subsequently transferred from PDVH to PDVSA, which controls PDVH (and CITGO Holding) and is thus an "insider."

    c.  By moving assets from its indirect U.S.-based subsidiary to its own coffers, PDVSA (and therefore Venezuela) retained control of the 2015 Dividend proceeds and moved them out of the United States to Venezuela, where they are immune from execution by creditors like Rusoro.

    d.  Before causing the transfer through the purported "dividend" payouts, Venezuela had either already been sued or threatened with suits with the potential to result in billions of dollars in arbitral awards and judgments against it.  In addition, Venezuela itself expressly and publicly recognized that the assets of its U.S. subsidiaries would be the primary targets for the enforcement of any unpaid arbitral awards.

e.   PDVSA and Venezuela wrongfully transferred the 2015 Dividend proceeds from the United States by moving offshore the monetized value of CITGO Holding, a domestic Delaware corporation that was the alter ego of Venezuela and PDVSA. As an alter ego, the assets of CITGO Holding were at risk of being attached and executed to pay arbitral awards against Venezuela.

f.   The "dividend" paid to PDVH, and ultimately to PDVSA and Venezuela, was an unlawful dividend insofar as it was not paid out of CITGO Holding's surplus (*i.e.* the excess of a corporation's net assets over the par value of its issued stock) or out of its net profits for the fiscal year in which the dividend was declared and/or the preceding fiscal year.  The dividend was further unlawful in that it effectively looted CITGO Holding.

g.   Venezuela publicly expressed its intent not to pay any arbitral award resulting from its expropriation of investments, as well as its intent to monetize CITGO Petroleum's assets, located in the United States, to avoid their seizure in fulfillment of such awards.

h.   The transfer of the 2015 Dividend proceeds to PDVSA along with the other orchestrated transactions (the 2016 Bond Swap and the 2016 pledge of the balance of the CITGO Holding stock effectively looted CITGO Holding and PDVH.

173.    The Rusoro Claim against Venezuela is enforceable against the Alter Ego Entities, which are alter egos of Venezuela and at all relevant times acted as its agents.

174.    Rusoro is entitled to the relief specified in the TUFTA, *see* TEX. BUS. & COM. CODE § 24.008, particularly, an order directing the return of the $2.8 billion removed from

CITGO Holding (or as much as necessary to pay the Venezuela debt owed to Rusoro in full), or imposing a money judgment equal to that amount on the Alter Ego Entities (up to the amount of the U.S. Judgment) should the funds not be returned.  Alternatively, Rusoro is entitled to the relief specified in the DUFTA, *see* 6 DEL. CODE § 1307.

175.    Rusoro is also entitled to an injunction barring any further transfers by PDVH or CITGO Holding for less than fair consideration until such time as the debt to Rusoro has been paid.

**SIXTH CAUSE OF ACTION**
**Illegal Dividend – CITGO Holding**
**(CITGO Holding Individual Defendants)**

176.     Rusoro repeats and realleges the allegations in paragraphs 1 through 175 as if set forth fully herein.

177.    CITGO Holding is an alter ego of Venezuela.  Rusoro is thus a creditor of Venezuela and CITGO Holding.

178.    Under Delaware law, a corporation's board of directors may declare and pay a dividend to the shares of its capital stock only out of the corporation's surplus, *i.e.* the excess of a corporation's net assets over the par value of its stock, or out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.  8 DEL. CODE § 170.

179.    The 2015 Dividend issued by CITGO Holding was greater than CITGO Holding's surplus and was not paid from its net profits for the fiscal year in which the dividend was declared and/or the preceding fiscal year.

180.    Under Delaware law, the 2015 Dividend was unlawful.

181.    The CITGO Holding Individual Defendants did not act in good faith in authorizing the 2015 Dividend.

182.    At all relevant times, CITGO Holding was insolvent or rendered so by the 2015 Dividend.  Upon information and belief, CITGO Holding had insufficient assets to satisfy its debts, including but not limited to claims of Rusoro and other similarly-situated creditors whose assets had been expropriated by Venezuela in violation of international law.

183.    It would be futile to request that CITGO Holding prosecute claims against the CITGO Holding Individual Defendants because CITGO Holding's management is controlled by Venezuela, for whose benefit the CITGO Holding Individual Defendants looted their company.

184.    The CITGO Holding Individual Defendants are jointly and severally liable to CITGO Holding for the full amount of the unlawful dividend.

<u>**SEVENTH CAUSE OF ACTION**</u>
**Illegal Dividend - PDVH**
**(PDVH Individual Defendants)**

185.    Rusoro repeats and realleges the allegations in paragraphs 1 through 184 as if set forth fully herein.

186.    PDVH is an alter ego of debtor Venezuela.  Rusoro is thus a creditor of Venezuela and PDVH.

187.    Under Delaware law, a corporation's board of directors may declare and pay a dividend to the shares of its capital stock only out of the corporation's surplus, *i.e.* the excess of a corporation's net assets over the par value of its stock, or out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.  8 DEL. CODE § 170.

188.    The 2015 Dividend issued by PDVH was greater than PDVH's surplus and was not paid from its net profits for the fiscal year in which the dividend was declared and/or the preceding fiscal year.

189.    The PDVH Individual Defendants did not act in good faith in authorizing the 2015 Dividend.

190.    At all relevant times, PDVH was insolvent or rendered insolvent by the 2015 Dividend. Upon information and belief, PDVH had insufficient assets to satisfy its debts, including but not limited to claims of Rusoro and other similarly-situated creditors whose assets had been expropriated by Venezuela in violation of international law.

191.    It would be futile to request that PDVH prosecute claims against the PDVH Individual Defendants because PDVH's management is controlled by Venezuela, for whose benefit the CITGO Holding Individual Defendants looted their company.

192.    The PDVH Individual Defendants are jointly and severally liable to PDVH for the full amount of the unlawful dividend.

**EIGHTH CAUSE OF ACTION**
**Breach of Fiduciary Duty to CITGO Holding**
**(CITGO Holding Individual Defendants)**

193.    Rusoro repeats and realleges the allegations in paragraphs 1 through 192 as if set forth fully herein.

194.    CITGO Holding is an alter ego of Venezuela.  Rusoro is thus a creditor of Venezuela and CITGO Holding.

195.    At all relevant times, CITGO Holding was insolvent. Upon information and belief, CITGO Holding had insufficient assets to satisfy its debts, including but not limited to claims of Rusoro and other similarly-situated creditors whose assets had been expropriated by Venezuela in violation of international law.

196.    The CITGO Holding Individual Defendants owed CITGO Holding a fiduciary duty to act with loyalty, prudently, with care, and in good faith.

197.    The CITGO Holding Individual Defendants breached their fiduciary duties by, among other things:

    a.    Failing to act as an ordinarily prudent director or officer would in approving the transactions that led to and comprised the 2015 Dividend;

    b.    Failing to inform themselves of available material facts when approving the transactions that led to and comprised the 2015 Dividend;

    c.    Failing to act in good faith in approving the transactions that led to and comprised the 2015 Dividend;

    d.    Approving the 2015 Dividend, which was not paid out of CITGO Holding's surplus or out of its net profits for the fiscal year in which the dividend was declared and/or the preceding fiscal year;

    e.    Looting CITGO Holding for the benefit of Venezuela;

    f.    Engaging in corporate waste by approving the 2015 Dividend.

198.    As a proximate result of the CITGO Holding Individual Defendants' breach of their fiduciary duties, CITGO Holding was damaged in the amount of not less than $2.8 billion plus interest.

199.    It would be futile to request that CITGO Holding prosecute claims against the CITGO Holding Individual Defendants because CITGO Holding's management is controlled by Venezuela, for whose benefit the CITGO Holding Individual Defendants looted their company.

200.    The CITGO Holding Individual Defendants are liable to CITGO Holding for the improper actions described above and herein.

## NINTH CAUSE OF ACTION
### Breach of Fiduciary Duty to PDVH
### (PDVH Individual Defendants)

201.    Rusoro repeats and realleges the allegations in paragraphs 1 through 200 as if set forth fully herein.

202.    PDVH is an alter ego of Venezuela.  Rusoro is thus a creditor of Venezuela and PDVH.

203.    At all relevant times, PDVH was insolvent or rendered insolvent based on the improper transactions described herein. Upon information and belief, PDVH had insufficient assets to satisfy its debts, including but not limited to claims of Rusoro and other similarly-situated creditors whose assets had been expropriated by Venezuela in violation of international law.

204.    The PDVH Individual Defendants owed PDVH a fiduciary duty to act with loyalty, prudently, with care, and in good faith.

205.    The PDVH Individual Defendants breached their fiduciary duties by, among other things:

      a.   Failing to act as an ordinarily prudent director or officer would in approving the transactions that led to and comprised the 2015 Dividend, the 2016 Bond Swap, and the 2016 pledge of the balance of the CITGO Holding stock;

      b.   Failing to inform themselves of available material facts when approving the transactions that led to and comprised the 2015 Dividend, the 2016 Bond Swap, and the 2016 pledge of the balance of the CITGO Holding stock;

c. Failing to act in good faith in approving the transactions that led to and comprised the 2015 Dividend, the 2016 Bond Swap, and the 2016 pledge of the balance of the CITGO Holding stock;

d. Approving the 2015 Dividend, which was not paid out of PDVH's surplus or out of its net profits for the fiscal year in which the dividend was declared and/or the preceding fiscal year;

e. Looting PDVH for the benefit of Venezuela;

f. Approving the collateralization of CITGO Holding in the 2016 Bond Swap and the 2016 pledge of the balance of the CITGO Holding stock;

g. Engaging in corporate waste by approving the 2015 Dividend; and

h. Engaging in corporate waste by approving the collateralization of the stock of CITGO Holding for debt that was owed by PDVSA.

206. As a proximate result of the breach of fiduciary duties by the PDVH Individual Defendants, PDVH was damaged in the amount of not less than $4.3 billion.

207. It would be futile to request that PDVH prosecute claims against the PDVH Individual Defendants because PDVH's management is controlled by Venezuela, for whose benefit the PDVH Individual Defendants looted their company.

208. The PDVH Individual Defendants are liable to PDVH for the improper actions described above and herein.

**TENTH CAUSE OF ACTION**
**Corporate Waste**
**(CITGO Holding Individual Defendants)**

209. Rusoro repeats and realleges the allegations in paragraphs 1 through 208 as if set forth fully herein.

210.    The CITGO Holding Individual Defendants had a duty not to waste corporate assets.

211.    The CITGO Holding Individual Defendants knew or should have known that the transfer of $2.8 billion from CITGO Holding to PDVH would result in the diminution of CITGO Holding's assets with no corresponding benefit to CITGO Holding.

212.    The decision of the CITGO Holding Individual Defendants to transfer the $2.8 billion loan proceeds to PDVH was so irrational or egregious that it could not have been based on a good-faith assessment of the corporation's best interests.

213.    No person of ordinary sound business judgment could view the benefits to CITGO Holding as a fair exchange for the incurrence of $2.8 billion of debt.

214.    The transfer of funds from CITGO Holding to PDVH served no corporate interest for CITGO Holding.

215.    In approving the transfers to PDVH, the CITGO Holding Individual Defendants committed corporate waste, which damaged CITGO Holding in the amount of $2.8 billion.

216.    It would be futile to request that CITGO Holding prosecute claims against the CITGO Holding Individual Defendants because CITGO Holding's management is controlled by Venezuela, for whose benefit the CITGO Holding Individual Defendants looted their company.

217.    The CITGO Holding Individual Defendants are liable to CITGO Holding for the improper actions described above and herein.

### ELEVENTH CAUSE OF ACTION
**Corporate Waste**
**(PDVH Individual Defendants)**

218.    Rusoro repeats and realleges the allegations in paragraphs 1 through 217 as if set forth fully herein.

219.     The PDVH Individual Defendants had a duty not to waste corporate assets.

220.     The PDVH Individual Defendants knew or should have known that the transfer of $2.8 billion from PDVH to PDVSA would result in the diminution of PDVH's assets with no comparable benefit to PDVH.

221.     The decision of the PDVH Individual Defendants to issue a dividend of $2.8 billion to PDVSA was so irrational or egregious that it could not have been based on a good-faith assessment of the corporation's best interests.

222.     The collateralization of the CITGO Holding stock to secure PDVSA loans was so irrational or egregious that it could not have been based on a good-faith assessment of the corporation's best interests.

223.     No person of ordinary sound business judgment could view the benefits to PDVH as a fair exchange for the loss of value of the CITGO Holding stock.

224.     In approving the transactions that led to and comprised the 2015 Dividend, the 2016 Bond Swap, and the pledging of the CITGO Holding stock for the benefit of PDVSA's obligations, the PDVH Individual Defendants committed corporate waste, which damaged PDVH.

225.     It would be futile to request that PDVH prosecute claims against the PDVH Individual Defendants because PDVH's management is controlled by Venezuela, for whose benefit the PDVH Individual Defendants looted their company.

226.     The PDVH Individual Defendants are liable to PDVH for the improper actions described above and herein.

**TWELFTH CAUSE OF ACTION**
**Conspiracy to Breach Fiduciary Duty**
**(Venezuela, PDVSA, PDVH, CITGO Holding, and CITGO Petroleum)**

227.     Rusoro repeats and realleges the allegations in paragraphs 1 through 226 as if set forth fully herein.

228.     Defendants Venezuela, PDVSA, PDVH, CITGO Holding, and CITGO Petroleum intended to cause the CITGO Holding Individual Defendants to breach the fiduciary duties they owed to CITGO Holding by causing CITGO Holding to incur $2.8 billion in bond debt and transferring $2.8 billion to PDVH as a dividend.

229.     Defendants Venezuela, PDVSA, PDVH, CITGO Holding, and CITGO Petroleum intended to cause the PDVH Individual Defendants to breach the fiduciary duties they owed to PDVH by causing PDVH to (a) transfer $2.8 billion to PDVH as a dividend in 2015, and (b) pledge PDVH's interest in CITGO Holding as security for a bond swap and debt transaction that did not benefit PDVH.

230.     Upon information and belief, Defendants Venezuela, PDVSA, PDVH, CITGO Holding, and CITGO Petroleum had a meeting of the minds and agreed to cause the CITGO Holding Individual Defendants and/or the PDVH Individual Defendants to breach their fiduciary duties to CITGO Holding and PDVH.

231.     As a result of the actions of defendants Venezuela, PDVSA, PDVH, CITGO Holding, and CITGO Petroleum, PDVH and CITGO Holding were damaged.

**THIRTEENTH CAUSE OF ACTION**
**Aiding and Abetting Breach Fiduciary Duty**
**(Venezuela, PDVSA, PDVH, CITGO Holding, and CITGO Petroleum)**

232.     Rusoro repeats and realleges the allegations in paragraphs 1 through 231 as if set forth fully herein.

- 56 -

233.    Defendants Venezuela, PDVSA, PDVH, CITGO Holding, and CITGO Petroleum aided and abetted the CITGO Holding Individual Defendants in their breach of fiduciary duties owed to CITGO Holding.

234.    Defendants Venezuela, PDVSA, PDVH, CITGO Holding, and CITGO Petroleum aided and abetted the PDVH Individual Defendants in their breach of fiduciary duties owed to PDVH.

235.    As a result of the actions of Defendants Venezuela, PDVSA, PDVH, CITGO Holding, and CITGO Petroleum, the CITGO Holding Individual Defendants breached their fiduciary duties to CITGO Holding, thereby damaging CITGO Holding.

236.    As a result of the actions of defendants Venezuela, PDVSA, PDVH, CITGO Holding, and CITGO Petroleum, the PDVH Individual Defendants breached their fiduciary duties to PDVH, thereby damaging PDVH.

## **CONCLUSION**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

(a)    Declaring that PDVSA is an alter ego of Venezuela and is liable to Rusoro for the total amount of the Rusoro Claim;

(b)    Declaring that PDVH is an alter ego of Venezuela and is liable to Rusoro for the total amount of the Rusoro Claim;

(c)    Declaring that CITGO Holding is an alter ego of Venezuela and is liable to Rusoro for the total amount of the Rusoro Claim;

(d)    Declaring that CITGO Petroleum is an alter ego of Venezuela and is liable to Rusoro for the total amount of the Rusoro Claim;

(e)     Entering judgment against PDVSA in favor of Rusoro for the total amount of the Rusoro Claim;

(f)     Entering judgment against PDVH in favor of Rusoro for the total amount of the Rusoro Claim;

(g)     Entering judgment against CITGO Holding in favor of Rusoro for the total amount of the Rusoro Claim;

(h)     Entering judgment against CITGO Petroleum in favor of Rusoro for the total amount of the Rusoro Claim;

(i)     Directing Venezuela, PDVSA, and PDVH to return the 2015 Dividend, plus prejudgment interest, (or as much as may be required to pay the U.S. Judgment in full) to CITGO Holding;

(j)     Awarding money damages against Venezuela, PDVSA, and PDVH equal to the amount of the Rusoro Claim, if they do not return the 2015 Dividend, plus prejudgment interest, to CITGO Holding;

(k)     Attaching property of CITGO Holding, PDVH, PDVSA, and Venezuela sufficient to satisfy the U.S. Judgment;

(l)     Barring any further transfers for less than fair consideration from PDVH or CITGO Holding until such time as the Rusoro Claim has been paid;

(m)     Awarding CITGO Holding damages against the CITGO Holding Individual Defendants;

(n)     Awarding PDVH damages against the PDVH Individual Defendants;

(o)     Awarding CITGO Holding damages for the conspiracy by the non-Individual Defendants in aiding and abetting the breach of fiduciary duty by the Individual Defendants;

(p)    Awarding PDVH damages for the conspiracy by the non-Individual Defendants in

aiding and abetting the breach of fiduciary duty by the Individual Defendants;

(q)    Awarding pre-judgment interest; and

(r)    Such other and further relief as is just.

Dated: Houston, Texas
May 7, 2018

Respectfully submitted,

Reginald R. Smith
Texas Bar No. 00792174
S.D. Tex. Bar. No. 18982
Tracey M. Robertson
Texas Bar No. 00792805
S.D. Tex. Bar. No. 26094

KING & SPALDING LLP
1100 Louisiana, Suite 4000
Houston, TX 77002
(713) 751-3200
rsmith@kslaw.com
trobertson@kslaw.com

James E. Berger
Texas Bar No. 24107426
Arthur J. Steinberg
Thomas C.C. Childs
Charlene C. Sun

KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2202
jberger@kslaw.com
asteinberg@kslaw.com
tchilds@kslaw.com
csun@kslaw.com